# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KELLY SONNENBERG, individually, and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>ISAI SCHEINBERG; PAUL TATE; NELSON BURTNICK; OLDFORD GROUP, LTD.; RATIONAL ENTERTAINMENT ENTERPRISES LTD.; PYR SOFTWARE, LTD.; STELEKRAM LTD.; SPHENE INTERNATIONAL LTD.;<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 13-344-MJR-SCW<br>)<br>)<br>)<br>)   **JURY TRIAL DEMAND**<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RATIONAL ENTERTAINMENT ENTERPRISES LTD.'S MOTION TO DISMISS FIRST-AMENDED COMPLAINT

### INTRODUCTION

As the basis for this lawsuit, Plaintiff invokes an ancient, and arguably anachronistic, gambling-loss recovery statute under Illinois law, 720 ILCS 5/28-8 (hereinafter "Illinois Loss Recovery Act" or "LRA")—a statutory creation of a vanished era where the absence of an organized police authority necessitated the intervention of third parties.[1]  In modern times, however, third-party intervention in gambling deterrence is no longer necessary given the extensive enforcement mechanisms available to the government.  In this case, the extent of the government's enforcement power is visible from Plaintiff's First-Amended Complaint ("FAC") itself, in which Plaintiff alleges that the government intervened in the PokerStars group of

---

[1] *See Salomon v. Taft Broadcasting Co.*, 475 N.E.2d 1292, 1293 (Ohio. App. 1984) (loss recovery act was "born in a vanished era where the absence of an organized police authority to enforce criminal statutes made necessary the use of such rewards for informers").

companies (d/b/a "PokerStars")[2] U.S. real-money operations and seized and forfeited "assets and proceeds" purportedly derived from the alleged "illegal acts" that Plaintiff now seeks to vindicate.

The circumstances in which Plaintiff instituted her cause of action mandate dismissal of this case. Plaintiff waited to file and serve her FAC until after the PokerStars group of companies forfeited to the United States all of its profits[3] arising from real-money poker play on its website by U.S. players—including players in Illinois. Although fully aware of the forfeiture proceedings, Plaintiff failed to assert a claim to these funds during that proceeding. Having waited until after the PokerStars group of companies agreed to a payment to the United States in excess of $700 million,[4] Plaintiff may not pursue a claim that would require the same group to pay those same monies a second time. Such double recovery would be grossly inconsistent with both federal forfeiture law and the LRA.

Even if these circumstances alone did not mandate dismissal of Plaintiff's cause of action, this Court should still dismiss Plaintiff's FAC in its entirety as to the only defendant

---

[2] The "PokerStars group of companies" consists of, among others, the corporate Defendants named in this case, including Rational Entertainment Enterprises Ltd. ("REEL")—the only entity that has been served in this case. As discussed in further detail below, Plaintiff fails to identify what this one entity (REEL) in the PokerStars group of companies does other than purportedly act as "the exclusive poker software developer and licensor for PokerStars," (*see* FAC ¶9) – a claim which is factually incorrect. "PokerStars," itself, is a brand name, not a corporate entity.

[3] The civil forfeiture complaint instituted against PokerStars in the Southern District of New York, *United States v. Pokerstars, et al*, 1:11-cv-02564-KMW (S.D.N.Y.), sought $1.5 billion, which allegedly represented the total amount of revenue processed through the site. The total PokerStars' settlement, $731 million, represents more than three times the amount of profit that PokerStars made in the U.S. market.

[4] While PokerStars settled with the United States Government for a total of $731 million, only $547 million of those total funds, or two times the profit, was actually forfeited. The remaining $184 million was paid directly to the non-U.S. players of Full Tilt Poker, whose assets PokerStars purchased directly from the government.

served in this matter to date—Defendant Rational Entertainment Enterprises Ltd. ("REEL"). In addition to the obvious jurisdictional deficiencies that afflict her FAC, Plaintiff's FAC fails as a matter of law on several, alternative grounds. First, Plaintiff fails to state a claim for relief against REEL because she fails to allege facts sufficient to show that REEL was a "winner" within the meaning of the LRA. Second, Plaintiff fails to identify even a single purported loser or loss which would entitle her to recovery. And, third, Plaintiff fails to allege that any of the PokerStars Defendants or the purported gambling loses were present in Illinois when playing on the PokerStars website, thus rendering the LRA inapplicable to her claims. For these reasons, and for the reasons set forth more fully below, this Court should dismiss Plaintiff's FAC in its entirety as to Defendant REEL.

## STATEMENT OF RELEVANT FACTS

### *Allegations Relating to Plaintiff*

In the FAC, Plaintiff alleges that she "is a party of interest in this controversy pursuant to 720 ILCS 5/28-8(b) not only because she is 'any person' within the definition of Section 28-8(b) but because she is and was at all times relevant directly related to and impacted by someone who lost money gambling on PokerStars." *See* FAC ¶2... Although the LRA does not establish a basis for class action pursuant to Fed. R. Civ. P. 23, Plaintiff seeks to represent a putative class of (1) "Illinois residents and persons qualified under 720 ILCS 5/28-8 to prosecute a civil suit against PokerStars…," and (2) "a state-wide class of Illinois residents closely related to gambling losers entitled to recover in a civil action as defined by 720 ILCS 5/28-8." *Id.* ¶4.

### *Allegations Relating to REEL*

Plaintiff alleges, in relevant part, that REEL is "a corporate person and the exclusive poker software developer and licensor for PokerStars." *Id.* ¶9.[5]  Despite making this allegation, Plaintiff then (inexplicably) alleges that REEL is one of the "Other Shell Company Defendants," which are alleged to be "corporate persons and subsidiaries of PokerStars created at various relevant times to help further the illegal goal of accepting internet gambling losses from Illinois residents." *Id.* ¶10.  Plaintiff asserts that this Court has personal jurisdiction over the various defendants because "all Defendants, through their conduct and participation with the Enterprise, have done significant and continuous business in the State of Illinois." *Id.* ¶15.[6]  REEL is alleged to be a member of the PokerStars enterprise by virtue of its alleged role as "the exclusive poker software developer and licensor for the Enterprise." *See id.* ¶23B.  Plaintiff further asserts that "[p]rofits from the PokerStars website, player deposits, gambling losses, licensing fees, agreements, merchandise sales, and other PokerStars ventures, were distributed amongst the Defendants." *Id.* ¶25.  In addition, although claiming that, "[o]n April 15, 2011, the card rooms were shut down by the Department of Justice" for "operating illegally in the United States," *see id.* ¶¶ 27, 28, Plaintiff nevertheless incongruously claims that "PokerStars ... resumed operations and continues to receive gambling losses from Illinois residents" after PokerStars "purchased" some and/or all of the Full Tilt Enterprise in or around August 2012, *see id.* ¶¶ 29, 30.

Other than in paragraphs 9, 10, and 23 of the FAC, REEL is not mentioned directly by name in any of the other factual allegations.  *See generally id.*  The only other time REEL is

---

[5] Plaintiff also (inaccurately) alleges that REEL is the "parent company of other PokerStars Companies." *See* FAC ¶9.

[6] Paragraph 21 of the FAC alleges that PokerStars' purported "direct commercial contacts" with Illinois residents, includes, among other things, "accepting gambling losses from Illinois residents," "soliciting players through internet advertisements and links," and "maintaining player accounts for all Illinois resident players ...." *See id.* ¶ 21.

referred to by name is in Count V, which repeats, almost verbatim, the same cause of action that is asserted against the other defendants in this case. *See id.* ¶¶56-60.

## ARGUMENT

I.  **The Forfeiture of the PokerStars Group of Companies' Profits by the United States—And Plaintiff's Decision Not to Challenge That Forfeiture—Precludes Plaintiff's Claim.**

First and foremost, Plaintiff's FAC should be dismissed because Plaintiff seeks to recover funds that have already been paid to the federal government in connection with a civil forfeiture complaint arising out of virtually identical conduct. As the FAC alleges, on April 15, 2011, the United States commenced a civil forfeiture proceeding in the United States District Court for the Southern District of New York ("SDNY") against the PokerStars group of companies[7] and other online poker companies in which the federal government sought the forfeiture of all of the PokerStars group of companies' revenues arising from real-money poker play by U.S. payer on its websites. *See FAC* ¶¶27, 28. On July 31, 2012, pursuant to a settlement of the federal proceeding, the SDNY entered a final order as to the PokerStars group of companies in which, among other things, the PokerStars group of companies forfeited a total of $731 million[8] to the U.S. government.[9] Despite having been fully aware of the civil forfeiture proceedings (as is

---

[7] REEL was a named defendant in the SDNY civil forfeiture proceedings.

[8] Under the agreement, the PokerStars group of companies undertook to forfeit to the U.S. government $547 millionand to pay $184 million to victims of offenses alleged to be committed by another poker operation, the Full Tilt Poker Group, which is a defendant in the related case of *Fahrner v. Raymond Bitar, et al.,* Case No.: 13-cv-00227-MJR-SCW, which is pending before this Court.

[9] A copy of the July 31, 2012 PokerStars Stipulation is attached hereto as **Exhibit 1**. Accordingly, it is properly considered as part of this Motion. *See Wright v. Assoc. Ins. Cos. Inc.,* 29 F.3d 1244, 1248 (7th Cir. 1994) (It is well-settled in this circuit that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss."); *Facebook, Inc. v. Teachbook.com LLC,* 819 F. Supp. 2d 764,

evident from the allegations in her FAC), Plaintiff failed to file a claim of any interest in the

forfeited funds   Plaintiff did not file or serve her FAC until after the filing of this final order of

forfeiture.  Accordingly, the forfeiture order precludes Plaintiff from pursuing those funds now.

Even if the PokerStars group of companies' money were to be characterized as

"winnings"—a characterization that the PokerStars Defendants dispute—the forfeiture of those

"winnings" bars Plaintiff from recovering that money from them a second time under this cause

of action.  There is no basis under either federal forfeiture law or the LRA in which a defendant

faces the prospect of paying back "winnings" not once, but twice.  The purpose of the claims

procedure in federal civil forfeiture proceedings is to ensure that all parties with an interest in the

*res* that is the subject of the forfeiture have an opportunity to be heard as to their interest in the

property before it is permanently and irrevocably forfeited to the United States.  *See United*

*States v. 51 Pieces of Real Prop. Roswell, N.M.,* 17 F.3d 1306, 1313 (10th Cir. 1994) (finding

that the timeliness of an objection to a civil forfeiture proceeding is important to a claimant's

legal defenses in that a  claimant must either file a claim or risk losing all interest in the

property").  Although others took this opportunity by filing a claim in the civil forfeiture

proceedings,[10] Plaintiff did not assert any right to the money she now seeks to recover.  That

money is now gone—forfeited to the United States by virtue of the order of a United States

District Judge.  There is no legal theory under civil forfeiture law which allows Plaintiff to file a

---

770 (N.D. Ill. 2011) (finding that courts are free to examine "documents incorporated into the
complaint by reference, and matters of which a court may take judicial notice" in evaluating a
motion to dismiss).  In the event the Court disagrees, REEL asks that this Motion be considered a
Motion for Summary Judgment for that purpose.  *See Harris v. Cook County Hosp.*, 971 F. Supp.
329 (N.D. Ill. 1997) (converting a motion to dismiss into a motion for summary judgment).

[10] For example, Cardroom International LLC filed a verified claim in *United States v.*
*Pokerstars, et al*, 1:11-cv-02564-KMW (SDNY, Docket No. 62), based on a pending claim for
damages it claims it is entitled to against various PokerStars and Full Tilt Poker defendants in a
California state action.

separate and second-in-time civil action seeking money that has already been forfeited. Likewise, the LRA does not provide for, nor contemplate multiple persons recovering for the same losses against the same winners. To allow such double recovery would flout the legislative intent of the statute. *See Holland v. Swain*, 94 Ill. 154, 157 (1879). It would also be grossly inconsistent with the equitable goal[11] of the LRA—to deter illegal gambling—which was already achieved when the federal government completely shut down PokerStars real-money website in the U.S. on April 15, 2011. *See Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997) (finding that the purpose of the statute is not simply to undo illegal gambling transactions but "to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism").

In a transparent attempt to overcome the legal hurdles barring her claim, Plaintiff makes the absurd, and wholly unsubstantiated, claim that, although "[o]n April 15, 2011, the card rooms were shut down by the Department of Justice," "PokerStars has since resumed operations and continues to receive gambling losses from Illinois residents." *See* FAC ¶¶27, 29. It is unclear from the face of the FAC whether Plaintiff is suggesting that PokerStars website resumed operations after the April 15 shut down but before the forfeiture of over $700 million in funds, or that the PokerStars website resumed operations after August 2012, when it purchased some or all

---

[11] It is incontrovertible that the relief sought by Plaintiff is equitable in nature. *See Jacob v. Clark's Comm.*, 66 S.W. 37, 38 (Ky. 1901) ("The general assembly evidently intended by these statutes to prevent, so far as possible, one winning money from enjoying it, and therefore gave to an entire stranger to the parties to the transaction the right to maintain an action...."); *People v. Coates*, 64 A.D.2d 1, 11, 407 N.Y.S.2d 866, 872 (1978) ("The civil law remedy...is designed to discourage gambling by putting people on notice that they may be divested of their winnings."); *Bender v. Arundel Arena, Inc.*, 248 Md. 181, 188, 236 A.2d 7, 11 (1967) ("To permit a civil recovery for gambling losses is legislative recognition that the gambling which produced the loss was illegal."); *Foley v. Whelan*, 219 Minn. 209, 211-12, 17 N.W.2d 367, 369-70 (1945) ("Statutes authorizing the loser at gambling to recover his losses from the winner and those making gambling an offense should be taken together as designed to prohibit and suppress gambling as a public evil.").

of Full Tilt Poker's assets as part of the forfeiture proceedings.  Either suggestion is absurd and, more importantly, categorically false.  *See* Affidavit of Pinhas Schapira at ¶¶10-12, attached hereto as **Exhibit 2**.  PokerStars did not defy the Department of Justice by re-opening in the U.S. or by accepting play from Illinois residents.  Accordingly, any conceivable gambling losses allegedly sustained by Illinois residents would have preceded April 15, 2011, and would have been known to Plaintiff during the pendency of the SDNY civil forfeiture proceedings as to which Plaintiff could have, but did not, file a claim.  As such, Plaintiff is not entitled to recovery here.[12]

## II.    **This Court Lacks Personal Jurisdiction Over REEL.**

Regardless of Plaintiff's motives in bringing her claim, this Court should dismiss Plaintiff's FAC against REEL – an out-of-state defendant – pursuant to Fed. R. Civ. P. 12(b)(2) because Plaintiff cannot carry her burden of establishing the existence of personal jurisdiction.

---

[12] Even if Plaintiff could recover under the LRA, she is not entitled to class action recovery, as her FAC is inappropriately stylized.  The LRA is not a class action statute.  Class action procedures are necessary in cases where recovery is achieved by the class representative (presumably, Plaintiff Kelly Sonnenberg in this case) and will be shared with the members of the class, who will thereafter otherwise be precluded from seeking relief.  Here, Plaintiff does not, and cannot, share the recovery with any class of people.  Plaintiff's purported class cannot consist of losers who seek recovery of their gambling losses because, under the LRA, there cannot be simultaneous suits of a loser and a *qui tam* plaintiff seeking recovery of the same losses. *See Holland v. Swain*, 94 Ill. 154, 157 (1879). Furthermore, to the extent those purported losses extend beyond the six-month period, the losers would be precluded from seeking recovery. *See Bartlett v. Slusher*, 215 Ill. 348, 349, 74 N.E. 370, 371 (1905) (affirming judgment dismissing claims as to all sums of money paid by appellee to appellants prior to the period of six months preceding the institution of the action).  Plaintiff's purported class also cannot consist of other third-party relators because the language of the statute limits third party actions to "any person," in the singular form.  It does not contemplate multiple recoveries by multiple persons. *See Holland*, 94 Ill. at 157 (noting that it was not the "legislative intention that after the expiration of six months the winner of property should be liable to the loser for the property, and that at the same time the winner should be liable in addition to treble the value to another in a *qui tam* act" and to do so, the courts would need to "increase the penal character of the statute by construction, which is not allowable").

*See Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).[13]

The Due Process Clause of the Fourteenth Amendment limits when a state may assert *in personam* jurisdiction over nonresident individuals and corporations. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997) (citing 735 Ill. Comp. Stat. 5/2-209(c)).[14]   A defendant must have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)).

What that standard means in a particular case depends on whether the state asserts "general" or "specific" jurisdiction. *RAR,* 107 F.3d at 1277.   General jurisdiction is permitted only where the defendant has "continuous and systematic business contacts" with the forum state. *Id.* (citation omitted).   Specific jurisdiction refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1983)).   "In specific jurisdiction cases, [courts] must decide whether a defendant has 'purposefully established minimum contacts within the forum

---

[13] A plaintiff must provide sufficient evidence to establish at least a *prima facie* case of personal jurisdiction. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987).   In deciding a motion to dismiss for lack of personal jurisdiction, the court may receive and consider affidavits from the parties. *Id.* Although the court resolves factual disputes in the pleadings and affidavits in favor of the plaintiff, it takes as true those facts contained in the defendant's affidavits that remain unrefuted by plaintiff. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997).

[14] In cases based upon diversity of citizenship, a federal court sitting in Illinois has personal jurisdiction over a nonresident defendant only if an Illinois court would have jurisdiction. *Klumpf v. Duffus*, 71 F.3d 1368, 1371 (7th Cir. 1995), *cert. denied*, 518 U.S. 1004 (1996). "Three distinct obstacles to personal jurisdiction must generally be examined: 1) state statutory law, 2) state constitutional law, and 3) federal constitutional law." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997) (citing 735 Ill. Comp. Stat. 5/2-209(c)).   "Because the Illinois statute authorizes personal jurisdiction to the constitutional limits, the three inquiries mentioned above collapse into two constitutional inquiries-one state and one federal." *Id.* Although "Illinois due process guarantee is not necessarily co-extensive with federal due process protections," Illinois courts have given "little guidance as to how state due process protection differs from federal protection in the context of personal jurisdiction." *Id.* Thus, courts "move on to address the federal constitutional issues directly." *Id.* at 1277.

State' and consider whether, by traditional standards, those contacts would make personal jurisdiction reasonable and fair under the circumstances." *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476-77 (1985)). "Crucial to the minimum contacts analysis is showing that the defendant "should reasonably anticipate being haled into court [in the forum State], because the defendant has "purposefully avail[ed] itself of the privilege of conducting activities" there." *Id.* (internal citations omitted).

### A. This Court Lacks General Personal Jurisdiction Over REEL.

Plaintiff's FAC fails to set forth facts sufficient to establish general personal jurisdiction over REEL.   The sole basis for Plaintiff's assertion of jurisdiction over REEL is the general and conclusory allegation that "all Defendants, through their conduct and participation with the Enterprise, have done significant and continuous business in the State of Illinois." *See* FAC ¶15. The FAC is wholly devoid of any allegation explaining how REEL falls within this cookie-cutter allegation.  The only paragraphs of the FAC specifically referencing REEL (paragraphs 9, 10, 23 and 56-60) fail to advance Plaintiff's claim of jurisdiction in any material way.  Plaintiff's claim against REEL rests solely on the allegation that REEL is the "exclusive poker software developer and licensor for PokerStars." *See* FAC ¶9.  Even if this were REEL's actual role within the PokerStars group of companies, which it is not (*see* **Ex. 2**, Schapira Affidavit at ¶6), that allegation alone is not enough to establish general personal jurisdiction over it.  In this case, REEL is the only entity among the PokerStars Defendants that has been served.  Yet Plaintiff purports to attribute to REEL a laundry list of so-called "PokerStars' direct commercial contacts with Illinois residents." *See* FAC ¶21.  While this list could arguably serve as basis for jurisdiction over the PokerStars Defendants as a whole if pled properly, it does not serve as the basis for jurisdiction over one entity alone – especially where Plaintiff is clearly misguided as to

that entity's role in the purported "Enterprise."  Apart from the jurisdictional allegations purportedly attributable to the "Enterprise" as a whole, the FAC fails to allege any "systematic or continuous contact" attributable to REEL, a foreign entity, in its own right.  Where there are multiple defendants, personal jurisdiction as to each must be considered separately.  *Wysnoski v. Millet*, 759 F. Supp. 439, 442 (N.D. Ill. 1991) (citing *Rush v. Savchuk*, 444 U.S. 320, 332 (1980) and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-99 (1980)).  Here, Plaintiff's failure to allege REEL's purported contacts with State of Illinois, individually, is fatal to Plaintiff's claim of general personal jurisdiction.

### 2.      **This Court Lacks Specific Personal Jurisdiction Over REEL.**

This Court similarly lacks specific personal jurisdiction over REEL.  The FAC lacks any allegation that jurisdiction "arises out of" or is "related to" REEL's minimum contacts with the State of Illinois.  Again, all of the allegations pertaining to REEL are either erroneously based on the assumption that REEL is the "exclusive poker software developer and licensor for PokerStars" or are based on what the PokerStars Defendants may have done collectively.  These allegations are not sufficient to establish what actions REEL, itself, may have taken to give rise to Plaintiff's claims.

Moreover, as the affidavit submitted herewith demonstrates, REEL did not "purposefully avail" itself of the benefits of conducting activities in the State of Illinois.  *See generally* **Ex**. **2**, Schapira Affidavit.  REEL, a foreign entity incorporated in the Isle of Man, has at no time maintained any offices, bank accounts, or agents in the State of Illinois.  *See id.* at ¶¶ 7-9.  Nor has REEL, or any of the PokerStars Defendants for that matter, offered real-money online poker in the State of Illinois, accepted deposits from individuals in the State of Illinois, or permitted the withdrawal of funds by individuals in the State of Illinois after the April 15, 2011.  *See id.* at ¶12.

Thus, the exercise of personal jurisdiction over Rational would not be reasonable nor would it comport with traditional notions of fair play and substantial justice. *Brandon Apparel Group, Inc. v. Quitman Mfg. Co. Inc.*, 42 F. Supp. 2d 821, 831 (N.D. Ill. 1999) (noting that, when undertaking a specific jurisdiction analysis, the court must determine whether exercising personal jurisdiction is "reasonable, i.e., comports with traditional notions of fair play and substantial justice").

## III.   Plaintiff's FAC Fails to State a Claim for Relief Under the LRA.

Even if Plaintiff could overcome the jurisdictional defects that afflict her FAC, her claim should alternatively be dismissed for failure to state a claim for relief pursuant to Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in a light favorable to the plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level ...." *Id.* at 555. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Indeed, a plaintiff is required to give sufficient notice of its claims to enable a Court "to determine at the outset of the litigation, before costly discovery is undertaken, whether the plaintiff has any tenable theory or basis of suit, so that if he does not the case can be got rid of immediately without clogging the court's docket and imposing needless expense on the defendant." *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999).

Plaintiff's FAC is an obvious fishing expedition, hoping to discover a claim for relief under the LRA. The LRA provides, in relevant part:

> Any person who by gambling shall lose to any other
> person, any sum of money or thing of value, amounting to

the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court. No person who accepts from another person for transmission, and transmits, either in his own name or in the name of such other person, any order for any transaction to be made upon, or who executes any order given to him by another person, or who executes any transaction for his own account on, any regular board of trade or commercial, commodity or stock exchange, shall, under any circumstances, be deemed a "winner" of any moneys lost by such other person in or through any such transactions.

720 ILCS 5/28-8(a).

Instead of alleging the essential elements of a claim under the LRA, Plaintiff makes generalized allegations based on alleged gambling losses by unidentified persons, in unknown and unidentified poker games, while playing in undisclosed locations. Courts have long held that penal statutes like the LRA must be narrowly construed. *E.g., Vinson v. Casino Queen, Inc.,* 123 F.3d 655, 657 (7th Cir. 1997) (qui tam statute "should not be interpreted to yield a ... result contrary to its purpose"); *State v. Shwabie,* 84 N.E.2d 768, 770-71 (Ohio Ct. App. 1948) (Ohio statute is penal and must be strictly construed).[15] As such, to state a claim under the LRA, a *qui tam* plaintiff must allege: (1) that an individual lost money; (2) to another person, (3) at "gambling," (4) in Illinois, (5) amounting to more than $50, and (6) the loser has not brought suit within six months. Here, Plaintiff's claims under the LRA are insufficient for three reasons.

---

[15] Illinois courts, like courts in other jurisdictions with similar statutes, have referred to the LRA as a "qui tam" statute given its penal nature in prosecuting gambling losses. *See Kizer v. Walden,* 65 N.E. 116, 120 (1902) (Illinois statute is penal); *Holland v. Swain,* 94 Ill. 154, 157 (1879) (finding that a third-party *qui tam* action under the statute only arises after the expiration of six months from time of the gambling loss); *see also Humphrey v. Viacom, Inc.,* 2007 WL 1797648 at *5 (D.N.J. June 20, 2007) (noting the "ancient and arguably anachronistic nature of *qui tam* actions" to recover gambling losses).

First, REEL is not a "winner" under the LRA.  Second, Plaintiff fails to identify a single loser and loss.  And, third, Plaintiff's failure to allege that defendants or the gambling losers were present in Illinois when playing on the site renders the LRA inapplicable to her claims.

### A.  REEL is Not a "Winner" Under the LRA.

Plaintiff's FAC is fatally flawed because REEL is not a "winner" under the LRA.  This Court need not accept as Plaintiff's unsupportable assertion that REEL, or any of the PokerStars Defendants for that matter, are "winners" under the statute.  Neither logic nor existing case law supports this bald assertion.

REEL is not a "winner" under the usual and ordinary meaning of the term.  "Statutory language must be given its plain and ordinary meaning, and courts are not free to construe a statute in a manner that alters the plain meaning of the language adopted by the legislature." *Murray v. Chicago Youth Ctr.*, 224 Ill. 2d 213, 235, 864 N.E.2d 176, 189 (2007).  According to Webster's Dictionary, a winner is defined as "a victor[,] especially in games and sports."  Given its plain meaning, a "winner" would have to participate in, or be a participant of, a game of poker to emerge the victor.  "Winning," therefore, necessarily connotes the risk of "losing," and one then cannot win if one does not play.

Also relying on the dictionary definition of the term "winner, the court in *Reuter v. MasterCard Intern., Inc.*, 397 Ill. App. 3d 915, 921 N.E.2d 1205 (2010), noted that a "winner" is defined as "a person or thing that wins" and that "win" is defined as "to gain a victory, succeed, to gain in competition, as a prize, victory in a contest."  *Id.* at 920.  There, the court rejected the notion that a credit card company could be a "winner" in online gambling transactions where players bought virtual chips on credit, and the companies profited by charging interest on unpaid balances at the end of the billing cycle.  In affirming the lower court's dismissal of the plaintiff's

claims, the Appellate Court of Illinois found it significant that the credit card companies did not directly participate in gambling, and concluded that the term "winner" does not encompass "'third-party facilitators' who might realize an incidental benefit from a gambler's loss." *Id.* at 925. Agreeing with the lower court that the LRA was "penal in nature," the court rejected plaintiff's argument that the strong public policy dictated a more liberal construction of the statute. *Id.* at 920.

Likewise in this case, this Court should "decline any construction [of the LRA] which would extend and enlarge the thrust and scope of the [statute]." *See Humphrey v. Viacom, Inc.,* No. 06-2768 (DMC), 2007 WL 1797648, at *5 (D.N.J. June 20, 2007) (interpreting analogous gambling-loss recovery statutes).[16]  Plaintiff's attempt to shoehorn the operator of an online card room (*see* FAC ¶19) would extend the LRA far beyond its statutory and intended purpose.  Here, the PokerStars Defendants are more akin to third party service providers, which merely provide a forum for **others** to play the game and have no stake in how the game is decided.[17]  Nowhere in

---

[16] Because the *Humphrey* court found "no substantial difference" between the New Jersey gambling recovery loss statute and the other gambling recover loss statutes at issue, including the Illinois LRA, its result and reasoning is applicable to this case. *Id.* at *2.

[17] Courts in other jurisdictions have similarly found that a third party who simply receives payment for hosting the game and providing administrative services is not a winner of any bet. *See., e.g., Las Vegas Hacienda v. Gibson,* 359 P.2d 85, 86 (Nev. 1961) (offering prize to winner of athletic or similar competition does not give rise to a wagering contract if the offer does not participate in the competition and has no chance of gaining back the prize offered); *State v. Am. Holiday Ass'n, Inc.,* 727 P.2d 807, 811 (Ariz. 1986) (holding that "reasonable entrance fees charged by the sponsor of a contest to participants competing for prizes are not bets or wagers"). The PokerStars Defendants primary concern is making sure the online poker service they offer is a safe, secure and fun environment.  This means they are focused on offering the best customer experience by providing an industry leading environment that has, for example, the best user interface, game integrity, cheat detection, chat moderation and site stability.  Customers are charged for the provision of this service.  The PokerStars Defendants are no more "winners" in this arrangement than a telephone company is a "winner" for charging its customers for making a call.

{M0134142.1}

the FAC does Plaintiff identify any bets or wagers the PokerStars Defendants allegedly made and won that would qualify them as "winners" under the statute.  Moreover, Plaintiff does not claim that any profits allegedly earned by the PokerStars Defendants were directly tied to any gambler's loss, or that any money allegedly "won" was dependent on the result of a bet.  *See* FAC ¶25 (alleging "profits" separately from "gambling losses").

As to REEL, the allegations are even scarcer.  Even accepting as true the threadbare allegations regarding REEL (*see id.* ¶¶9, 10, and 23) and its purported position within the so-called "Enterprise,"[18] Plaintiff does not claim—nor could it—that REEL (or any of the PokerStars Defendants) is a player or somehow participated in the actual online poker play.  In this sense, REEL is similar to an organizer of any sport or contest (*e.g.,* chess tournament) that collects a fee in advance of the game independent of any loss, provides a forum for **others** to play the game, and has no stake in how the game is decided.  As one court aptly noted, "[t]o suggest that one can be a winner without risking the possibility of being a loser defies logic and finds no support in the law."  *Humphrey*, 2007 WL 1797648, at *9; *see also Zellers v. White*, 208 Ill. 518, 527, 70 N.E. 669, 672 (1904) (stating that "winners" are players that "have won more than they have lost during the sitting" of a poker game).  As Plaintiff has failed to allege sufficient facts to support a finding that REEL "won" any money at gambling, she fails to state a claim under the LRA.

**B.  Plaintiff Fails to Identify a Loser or Loss.**

Alternatively, this Court should dismiss the FAC as against REEL because Plaintiff fails to identify a purported loser or loss.  Even under the most liberal pleading standards, Plaintiff's

---

[18] Plaintiff claims that REEL is the "exclusive poker software developer and licensor for PokerStars." FAC ¶9.  The attached affidavit provides otherwise. *See* **Ex. 2**, Schapira Affidavit at ¶6.

FAC lacks this basic factual predicate necessary to support a claim under the LRA.  Plaintiff fails

even to attempt to allege a single loser who purportedly suffered "losses" playing on the

PokerStars website or that any of these unidentified individuals failed to seek recovery from the

defendant.  Similarly, Plaintiff fails to identify a single, quantifiable loss associated with any

loser that would satisfy the LRA's jurisdictional minimum.  Requiring plaintiffs to plead the

identity of the purported losers, rather than merely alleging that some unknown gambling loser

exists somewhere, is necessary to put a defendant on notice of the claims against it and failure to

do so deprives a defendant of the ability to test the merits of those claims.

Of the approximately 30 existing gambling-loss recovery statutes—nearly 20 of which

allow for third-party recovery of some kind—there is very little case law addressing whether a

person may recover on behalf of multiple, unnamed and unknown losers and multiple unknown

and unspecified losses.  Nevertheless, in the few cases that have addressed the issue, **without**

**exception**, the courts have construed the gambling loss-recovery statutes not to permit the

recovery sought here.  *See Reuter v. MasterCard Int'l*, 921 N.E.2d 1205, 1210 (Ill. App. 5th Dist.

2010) (dismissing claims that fail to identify losers and noting that plaintiff cannot bring an

action "on behalf of an unidentified putative statewide class of alleged losers at gambling");

*Johnson v. McGregor*, 41 N.E. 558, 559 (1895) (identifying gambling loser); *see also Salamon v.*

*Taft Broadcasting Co.*, 475 N.E.2d 1292, 1298 (Ohio Ct. App. 1984) ("It is significant that no

authority is cited to us from anywhere in this jurisdiction or elsewhere which would permit a

third person, wholly a stranger to the transaction, to recover for his own use, unknown (but

presumably substantial) amounts of money lost by unnamed and unknowable persons in

unspecified games of chance.").  As such, Plaintiff's failure to identify even a single loser or loss

mandates dismissal of her FAC.

## C. Plaintiff Fails to Allege that the "Winner" or "Loser" Were Present in Illinois at the Time of the Alleged Loss.

Despite Plaintiff's repeated assertions that she is pursuing her claims on behalf of "Illinois residents" (*see, e.g.,* FAC ¶11), her failure to allege that the PokerStars Defendants (including REEL) or the purported gambling losers were present in Illinois when playing on the PokerStars site renders the LRA inapplicable to her claims. The LRA, like any Illinois penal law, only applies if the offense is committed wholly or partly in Illinois or if the activity outside the state is an attempt to commit an offense within the state. 720 ILCS 5/1-5. Such a limitation is consistent with the dormant commerce clause, which precludes a state from regulating activity occurring wholly in another state. *See Healy v. The Beer Institute*, 491 U.S. 324, 335-36 (1989) (imposition of one state's laws on individuals in another state violates the commerce clause); *Quill Corp v. North Dakota*, 504 U.S. 298, 306-07 (1992) (same); *Midwest Title Loans v. Mills*, 593 F3d 660, 664-65 (7th Cir. 2010) (same). It also avoids significant conflicts of laws issues. Gambling laws differ from state to state, and applying the law of the jurisdiction where the gambling took place ensures other states do not substitute their own gambling policy for that of the host state that has the most direct connection to the activity. Laws in other states may limit or bar recovery by gambling losers, require gambling losers to share in their recovery with the state, or have conflicting statutes of limitation.[19] Many states do not let gambling losers sue

---

[19] *See, e.g.,* Md. Code Crim. L. § 12-110 (no third party actions); Mich. C.L.A. § 750.315 (same); Miss. Code Ann. § 87-1-5 (same); Mo. Ann. Stat. § 434.030 (same); New Mexico Stat. Ann. § 44-5-1 (same); Va. Code Ann. § 11-15 (same, only 3 month statute of limitation); W. Va. Code § 55-9-2 (same); Ala. Code 1975 § 8-1-150 (allowing third party suits, but only on behalf of a wife, child, or next of kin); Mont. Code Ann. § 23-5-131 (no third party suits, but may sue on behalf of a dependent); S.D.C.L. § 21-6-2 (claims must be brought by state's attorney); Indiana Code § 34-16-1-4 (allowing suit only by a prosecuting attorney on behalf of a child, a spouse, or the state general fund); O.C.G.A. § 13-8-3 (requiring a third party plaintiff's recovery to be for the ─joint use of himself and the educational fund of the county.‖); D.C. Code § 16-

to recover losses at all, and, thus, it would not make sense for Illinois to impose its policy decisions on those other states by allowing individuals located in those states to recover in contravention of the loser's state's policy.

Indeed, Illinois courts regularly apply the law of the host state when considering gambling transactions and have dismissed loss recovery actions because gambling was legal in the location where gambling took place.  For example, in *Cie v. Comdata Network, Inc.*, 656 N.E.2d 123, 125 (Ill. App. Ct. 1995), plaintiffs sought to have cash advances obtained in legal betting parlors in Illinois and in Nevada casinos deemed unenforceable "gambling contracts" pursuant to Section 28-7, which voids obligations incurred in violation of the LRA. The court held, among other things, that "Article 28 of the Criminal Code simply does not apply to gambling committed wholly outside of Illinois and defendant's conduct in Nevada was not 'in violation of' the Gambling Act." *Id.* at 129 (citation omitted).  Similarly, the Seventh Circuit upheld the dismissal of a case because the LRA did not apply in the location where the gambling occurred.  In *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 656 (7th Cir. 1997), a mother sued to recover gambling losses on behalf of her teenage son, who had snuck onto a riverboat to gamble, alleging that gambling by a minor constituted illegal gambling. The court dismissed the suit because the alleged gambling took place on a riverboat where gambling was legal. *Id.* at 657 (finding that mother of minor gambler could not recover because gambling took place in a place where it was authorized).

Here, the location of the alleged "winners" and "losers" at the time the purported gambling took place is critical to the Court's analysis and application of law.  Because Plaintiff's FAC neglects to set forth that essential allegation, her FAC fails as a matter of law.

---

1702 (requiring third-party plaintiffs to share recovery with the District of Columbia); S.C. Code § 32-1-20; Tenn. Code. Ann. § 28-3-106 (1 year, 3 months statute of limitation).

## CONCLUSION

For the foregoing reasons, this Court should dismiss the FAC in its entirety as to

Defendant REEL.

Dated: April 16, 2013

MATHIS MARIFIAN & RICHTER, LTD.          IFRAH PLLC

By: ___ */s/ William J. Niehoff* ___          By: ___ */s/ David B. Deitch (w/consent)* ___
William J. Niehoff, #6193763                    David B. Deitch *(admitted pro hac vice)*
Laura E. Schrick, #6284750                      A. Jeff Ifrah *(admitted pro hac vice)*
23 Public Square, Suite 300                     Rachel Hirsch (Bar No. 991122)
Belleville, Illinois  62220                     1717 Pennsylvania Avenue, Suite 650
(618) 234-9800                                  Washington, D.C. 20006
(618) 234-9786 Fax                              Telephone: (202) 524-4140
                                                Facsimile: (202) 524-4141
                                                jeff@ifrahlaw.com
                                                ddeitch@ifrahlaw.com
                                                rhirsch@ifrahlaw.com

                                                Attorneys for Defendant,
                                                *Rational Entertainment Enterprises Ltd.*

## CERTIFICATE OF SERVICE

This is to certify that a copy hereof was served upon all attorneys of record by electronic

delivery via the CM/ECF System on April 16th 2013, addressed as follows:

Lloyd M. Cueto                    Michael Gras
Law Offices of Lloyd M. Cueto     Law Office of Christopher Cueto, LTD
7110 West Main Street             7110 West Main Street
Belleville, IL 62223              Belleville, Illinois 62223

                    ___ */s/ William J. Niehoff* ___

{M0134142.1}          - 20 -