# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHRISTOPHER LANGONE,

    Plaintiff,

v.

PATRICK KAISER AND FANDUEL, INC.,

    Defendants.

No. 12 C 2073

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher Langone brings this claim under the Illinois Loss Recovery Act, 720 ILCS 5/28-8, seeking to recover money that Defendants Patrick Kaiser and FanDuel, Inc., allegedly won playing fantasy sports games on the internet. R. 8. Defendants have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). R. 12. For the following reasons, Defendants' motion is granted.

## Background

Langone alleges that FanDuel, a Delaware corporation with its principal place of business in Edinburgh, Scotland, R. 8 ¶ 18, owns a website that hosts fantasy sports games. *Id.* ¶¶ 23-28. The parties agree that like typical fantasy sports games, FanDuel's games allow participants to choose "'professional players in a given sport . . . and to compete against other fantasy sports participants based upon the actual performance of those players in key statistical categories.'" R. 13 at 3 (quoting *Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *1 (D.N.J. June 20, 2007)); R. 8 ¶¶ 27, 30-31. Unlike typical fantasy sports games, which are based on a

sport's entire season, FanDuel's games are based on only one day's worth of performances. R. 8 ¶¶ 27, 30-31; R. 13 at 3.

Defendants admit that Kaiser is both a participant in daily fantasy sports games and the operator of www.draftadaysports.com. R. 13 at 3-4. Langone alleges that www.draftadaysports.com is a fantasy sports website that directs participants to FanDuel's games, and that the website was "Powered by Fan Duel." R. 8 ¶ 25. Langone alleges that he is a New York resident, *id.* ¶ 14, and Kaiser is an Illinois resident. *Id.* ¶ 15.

Langone alleges that FanDuel requires participants in its fantasy sports games to pay an "entry fee" of $5, $10, $25, $50 or $100 and to play in groups or "leagues" of two, five or ten participants. *Id.* ¶ 33-34. Potential winnings are greater for the leagues with higher entry fees and greater numbers of players, but the potential winnings are predetermined for any given league. *Id.* FanDuel takes a "commission" of ten percent of the entry fees. *Id.* ¶¶ 8, 33. The remaining 90 percent of the entry fees for a given league constitutes the prize for the participant who wins the league. *Id.* ¶ 33. Langone alleges that by engaging in this activity, FanDuel "sells pools upon the result of games or contests of skill and chance." *Id.* ¶ 21.

Langone alleges that FanDuel's "daily" fantasy sports games are illegal gambling under Illinois law. R. 8 ¶¶ 10-11, 13. He seeks to recover money that FanDuel and Kaiser allegedly have won from participants in daily fantasy sports

2

games. *See* R. 8. Langone brings his claims under the Illinois Loss Recovery Act, which provides the following:

> (a) Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court. . . .
> (b) If within 6 months, such person who under the terms of Subsection 28-8(a) is entitled to initiate action to recover his losses does not in fact pursue his remedy, any person may initiate a civil action against the winner. The court or the jury, as the case may be, shall determine the amount of the loss. After such determination, the court shall enter a judgment of triple the amount so determined.

720 ILCS 5/28-8.

Langone's complaint includes three counts. In Count I, Langone seeks to recover money from FanDuel and Kaiser that Sean Clement, of Libertyville, Illinois, allegedly lost to FanDuel and Kaiser playing fantasy sports games on www.draftadaysports.com. R. 8 ¶ 50. Langone alleges that "based upon [Clement's] volume of play, it is more likely than not that [Clement] has lost over $50." *Id.* Count I also alleges that several other named individuals "gambled and lost" on www.draftadaysports.com. *Id.* ¶ 52.[1] Langone alleges that additional "persons may be named as John Does [and] contends that he will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *Id.* ¶ 42.

---

[1] Those individuals are Kyle Durno, Erik Maverick Scott, Zach Criswell, Ricky Epperson, Parker Jay Johnson, Nathan Kaiser, Scot Scholz, and Matt Clement. R. 8 ¶ 52.

3

Langone also alleges that "[o]ther circumstantial evidence that suggests that gamblers lost more than $50 on draftadaysports.com is that the site offers games for wagers up to $270 on a single game and promises $20,000 in cash payouts every day." *Id.* ¶ 51.

In Count II, Langone seeks to recover $403,585.88 from Kaiser that Fantasy Sports Day Corp. allegedly lost to Kaiser, when Kaiser played fantasy sports games on a website owned and operated by Fantasy Sports Day Corp. *Id.* ¶¶ 55-69.

In Count III, Langone seeks to recover $109,586.34 from Kaiser that FanDuel allegedly lost to Kaiser, when Kaiser played fantasy sports games on FanDuel's website. *Id.* ¶¶ 70-79.

## Discussion

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This "standard demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts as true all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Id.*

The "Loss Recovery Act should not be interpreted to yield an unjust or absurd result contrary to its purpose." *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997). Illinois statutes like the Loss Recovery Act that are "penal in their nature," *Robson v. Doyle*, 61 N.E. 435, 437 (Ill. 1901), "must be strictly construed." *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1023 (7th Cir. 2013); *see also Reuter v. MasterCard Int'l, Inc.*, 921 N.E.2d 1205, 1211 (Ill. App. Ct. 5th Dist. 2010) (noting that an Illinois Circuit Court "explained that the [Loss Recovery Act] is penal in nature and must therefore be strictly construed.").

A.  **Count I**

1.  **Subject Matter Jurisdiction**

Langone has sufficiently alleged that the parties are diverse, and the parties agree that Langone's allegations satisfy the $75,000 amount in controversy required for diversity jurisdiction under 28 U.S.C. § 1332. *See* R. 26; R. 27. The parties' agreement as to federal jurisdiction is not enough. Federal Rule of Civil Procedure 12(h)(3) requires the Court to dismiss the action if the Court "determines at any time that it lacks subject-matter jurisdiction," including whether the allegations

5

satisfy the amount in controversy requirement. *See Carroll v. Stryker Corp.*, 658 F.3d 675, 680 (7th Cir. 2011). Langone must "satisfy the amount in controversy requirement against each individual defendant" unless the defendants are jointly liable. *Middle Tenn. News Co., Inc. v. Charnel of Cincinnati, Inc.*, 250 F.3d 1077, 1081 (7th Cir. 2001).

Langone has failed to make even a bare assertion that he could recover more than $75,000 based on the money that Sean Clement and the other individuals named in Count I allegedly lost to FanDuel and Kaiser. Nowhere in Count I does Langone even reference 28 U.S.C. § 1332 or the $75,000 jurisdictional minimum. Even assuming that draftadaysports.com does payout $20,000 every day, as Langone alleges, Langone has not alleged that Clement or any of the other individuals Langone names in Count I have lost a portion of those alleged payouts sufficient to satisfy the jurisdictional minimum. Therefore, Count I against FanDuel is dismissed for lack of subject matter jurisdiction.[2]

Although not alleged in his complaint, Langone asserts in his briefing that an individual named Danny Sobot lost more than $75,000 to FanDuel. R. 42 at 4 n.5; *see also* R. 17 at 6 n.2.[3] Langone sued Sobot in a separate case to recover money that

---

[2] Langone's allegations in Counts II and III that Kaiser won in excess of $75,000 do not serve to meet the jurisdictional requirement with respect to FanDuel, because Langone's allegation that FanDuel and Kaiser are "jointly and severally liable" is with respect to Count I only. R. 8 ¶¶ 6, 25. This is particularly true of Count III where Langone alleges that FanDuel lost the money Kaiser is alleged to have won.

[3] Langone does not allege that Sobot lost money to FanDuel in his complaint. But Langone argues that he would seek leave to amend the complaint to include allegations of Sobot's losses to FanDuel, R. 17 at 6 n.2, so the Court is considering

6

Sobot allegedly won from FanDuel; that case has since been dismissed with prejudice. *See Langone v. Sobot*, 12 C 01646, R. 37 (N.D. Ill. Mar. 11, 2013). Langone references documents he filed in that case containing information taken from the website Rotogrinders.com—a website that purports to record the fantasy sports games winnings of its members. *Id.* R. 14-1 - R. 14-120. The data that Langone cites, however, appears to list only Sobot's *winnings* from fantasy sports games on FanDuel, not his *losses*. *Id.* Contrary to Langone's allegations, these documents do not show that Sobot lost money to FanDuel, and so they cannot support a claim against FanDuel under the Loss Recovery Act, let alone demonstrate that the Court has subject matter jurisdiction.[4]

### 2. Losers

Langone also argues that the Loss Recovery Act does not require him to allege specific individual losers. In his briefing in the *Sobot* case, Langone argued that the Loss Recovery Act § 8(b) "does not state that Plaintiff's civil action is to be initiated 'on behalf' of anyone," and it does not require him to "identify a cognizable loser." *Langone v. Sobot*, 12 C 01646, R. 14 at 4-5 (N.D. Ill. May 25, 2012). Langone notes that whereas § 8(a) requires a plaintiff to have lost money to another person, § 8(b) simply provides that "any person may initiate a civil action against the winner." *Id.* With this reasoning, Langone implies that he can meet the $75,000

---

arguments based on allegations regarding Sobot's losses in the interests of efficiency.

[4] Sobot admitted that he lost money playing fantasy sports games, *see Langone v. Sobot*, 12 C 01646, R. 17 at 1 n.1 (N.D. Ill. June 1, 2012), but this bare admission is an insufficient basis for Langone to allege that his claim against FanDuel and Kaiser in Count I meets the $75,000 threshold.

7

minimum and state a claim under the Loss Recovery Act merely by alleging that FanDuel pays out $20,000 per day and inferring that somebody lost that money. R. 8 ¶ 51.

Even if Langone is correct that § 8(b) provides a cause of action wholly separate from § 8(a), § 8(b) plainly states that a non-loser-plaintiff does not have a cause of action until the gambling loser has failed to bring suit within six months of the loss. Langone cannot allege that six months have passed without alleging the date of a loss and whether the relevant loser has failed to bring a claim. Thus, in order to allege a ripe claim under the Loss Recovery Act, Langone must allege that a specific loser lost a certain amount and failed to bring a claim for that amount within six months. He has failed to do that here.

Furthermore, § 8(b) merely provides that "any person may initiate a civil action against *the* winner." (emphasis added). This provision is vacuous without reference to the circumstances of a specific person losing a certain amount to a specific winner as provided in § 8(a). Without these specific criteria, § 8(b) begs the question of what "civil action" "any person" is permitted to "initiate." Clearly, § 8(a) provides the answer and sets forth the aforementioned elements of a cause of action.

Similarly, Langone's interpretation of the statute would render superfluous the language in § 8(b) that references § 8(a) (i.e., the following language: "If within 6 months, such person who under the terms of Subsection 28-8(a) is entitled to initiate action to recover his losses does not in fact pursue his remedy . . . ."). *See KM Enters., Inc. v. Global Traffic Tech., Inc.*, 725 F.3d 718, 729 (7th Cir. 2013)

8

("Interpretations that render words of a statute superfluous are disfavored as a general matter . . . ."). On Langone's interpretation, § 8(b)'s reference to § 8(a) only serves to give gambling losers in § 8(a) a six month head start on recovering their losses before a non-loser-plaintiff is permitted to initiate a wholly separate action seeking gambling winnings under § 8(b). But if this was all the legislature intended, it could simply have written § 8(b) to permit any plaintiff to recover any gambling winnings that are at least six months old without referencing § 8(a) at all. Instead, the legislature expressly tied a non-loser-plaintiff's right of action to the failure to bring an action by "such person who under the terms of Subsection 28-8(a) is entitled to initiate action to recover his losses." This express link between § 8(a) and § 8(b) demonstrates that the legislature did not intend to create two causes of action—one under § 8(a) and another under § 8(b)—but rather for the non-loser-plaintiff of § 8(b) to step into the shoes of the loser of § 8(a). For § 8(b)'s reference to § 8(a) to have any substance, it must be understood to place a condition on the clause in § 8(b) permitting "any person [to] initiate a civil action against the winner" and to require non-loser-plaintiffs to allege the elements of § 8(a), i.e., who was the winner, who was the loser, when the loss took place, and the amount of money lost.

Moreover, § 8(b) only permits a non-loser plaintiff to recover money from "*the* winner," demonstrating that the legislature intended to limit a non-loser plaintiff's cause of action to the cause of action the loser could have brought against "the winner" described in § 8(a). The Chicago Manual of Style provides that the definite article "the" is used when the reader knows exactly to which subject the writer

9

refers. 16th ed. (2010), at 222-23. If the legislature had intended to permit non-loser plaintiffs to bring actions against gambling winners generally, without specifically identifying the related losers, the legislature would have used the indefinite article "a" and permitted plaintiffs to sue "*a* winner" not necessarily "*the* winner" described by § 8(a). In short, the Loss Recovery Act requires an allegation of specific individual losers.

Langone also contends that "[i]f a copyright owner can sue a John Doe defendant and discover his identity, as for instance the RIAA routinely does in music downloading cases, then Plaintiff should be allowed to plead without providing the names of persons who wagered on 'Daily Fantasy' games." R. 17 at 5. Even if the Loss Recovery Act did not require Langone to plead the identity of the gambling loser—which, as the Court just explained, it does—the conditions necessary to make John Doe pleading appropriate are not present here.

Typically, courts permit plaintiffs to plead John Doe defendants only when the plaintiffs can otherwise state a claim for some harm they have suffered. John Doe pleading is necessary to protect plaintiffs who do not know the identity of the person who caused them harm because such plaintiffs would otherwise not have a means to redress the harm they have suffered. *See, e.g., Bicycle Peddler, LLC v. Does 1-12*, -- F.R.D. --, 2013 WL 3455849, at *2 (N.D. Ill. July 9, 2013); *see also UMG Recordings, Inc. v. Doe*, 2008 WL 2949427, at *4 (N.D. Cal. July 30, 2008) (permitting early discovery as to John Doe defendants "where a plaintiff makes a prima facie showing of infringement . . . . [and when] early discovery avoids

10

ongoing, continuous harm to the infringed party and there is no other way to advance the litigation"). Langone has not been harmed here. Additionally, the John Doe losers are not alleged to have harmed anyone. Absent circumstances of a plaintiff seeking to redress harm caused by an unidentified defendant there is no reason to permit John Doe pleading.

Furthermore, to properly plead a John Doe defendant, a plaintiff must be able to show that the Court has personal jurisdiction over John Doe. Plaintiffs in copyright infringement internet downloading cases are able to make a showing that a court has personal jurisdiction over John Doe defendants because the plaintiffs know the geographic locations associated with the IP addresses. *See, e.g., Pacific Century Int'l, Ltd. v. Does 1-37*, 282 F.R.D. 189, 195-96 (N.D. Ill. 2012) (quashing subpoena to internet service provider seeking identities of IP address users engaged in illegal downloading that were not located in the district). Here, Langone has no way of knowing where the hypothetical John Doe gambling losers reside, and, thus, Langone cannot make a showing that the Court has jurisdiction over actions committed by those individuals, or that their conduct is subject to Illinois law. *Cf. Cie v. Comdata Network, Inc.*, 656 N.E.2d 123, 129 (Ill. App. Ct. 1st Dist. 1995) ("Article 28 of the Criminal Code simply does not apply to gambling committed wholly outside of Illinois.").

Notably, the Illinois Supreme Court dismissed a complaint and motion for discovery in a case just like this one. In *Robson v. Doyle*, 61 N.E. 435 (Ill. 1901), the plaintiff knew of two people who lost money to a third, and brought an action to

recover that money. The plaintiff also sought discovery from the winner to learn who else had lost money to him. *Id.* at 436. The court rejected the plaintiff's motion because it sought "to compel the [winner] to disclose a cause of action against himself," and it was "purely a fishing bill so far as it seeks such discovery." *Id.* The court continued that the "very purpose of the discovery is to subject the defendant to the penalties prescribed by the statute," and "courts of equity have always withheld their aid in actions which were penal in nature." *Id.* at 437. The court then remanded the case with instructions to dismiss. *Id.* at 438. Langone seeks exactly what the Illinois Supreme Court has held should not be available to him. For these reasons, the Court will not permit Langone to plead John Doe gambling losers.

Therefore, Count I against FanDuel and Kaiser is dismissed because Langone has failed to allege when and how much money Sean Clement and the other named individuals (Kyle Durno, Erik Maverick Scott, Zach Criswell, Ricky Epperson, Parker Jay Johnson, Nathan Kaiser, Scot Scholz and Matt Clement) lost to FanDuel and to Kaiser.

### 3. Winners

Even if Langone had sufficiently alleged that specific individuals had lost the jurisdictional minimum amount of money to FanDuel, the Court would still dismiss Count I as to FanDuel and Kaiser in his capacity as operator of www.draftadaysports.com because neither is a "winner" under the Loss Recovery Act. Langone alleges that FanDuel is a "winner" because FanDuel takes a "commission" from the entry fees paid by participants in its games. Langone does

not allege, however, that FanDuel participates in the games itself. Rather, Langone relies on *Pearce v. Foote*, 113 Ill. 228 (1885), and *Kruse v. Kennett*, 54 N.E. 965 (Ill. 1899), which held that commodities futures brokers who took commissions on the trades they executed were "winners," at a time when trading in futures was considered illegal gambling. The court in *Pearce* held that even though the brokers derived profit from the commissions as opposed to the gain from the illegal trades or "wagers," the brokers were nonetheless "actively participating [as] principals" in the illegal gambling activity. *Pearce*, 113 Ill. at 238.

But although FanDuel also derives its profit from commissions, FanDuel's role in its fantasy sports games is decidedly different from the brokers in *Pearce*. The Illinois Supreme Court held that the brokers were winners not because they collected commissions on gambling activity, but because the brokers *participated in the risk* of the trade or "wager." The brokers or their client could be "winners" or "losers" depending "on the happening of a certain [future] event." *Id*. at 239. The gain or loss the client would earn from the trade was uncertain when the agreement with the broker was consummated, and "if there was a loss, [the client] was to pay it to [the brokers], and if there was a gain, [the brokers] were to pay it to [the client]." *Id*. at 237-38 (alterations added; internal quotation marks omitted). The brokers took a risk that the loss incurred on the trade might be so great that the client would not be able to cover it, or that the client's gain might be so great that the brokers would not be able to cover it. *See id*. at 236 (explaining that the client had paid the brokers only part of what he owed them).

13

By contrast, here, FanDuel risks nothing when it takes entry fees from participants in its fantasy sports games. The prize that FanDuel is obligated to pay is predetermined according to the number of participants in a given league, and never exceeds the total entry fees. FanDuel does not place any "wagers" with particular participants by which it could lose money based on the happening of a future event (i.e., the performance of certain athletes), but merely provides a forum for the participants to engage each other in fantasy sports games. Unlike the relationship between the brokers and client in *Pearce,* the forum FanDuel creates requires fantasy sports participants to compete against each other in leagues with the result that they know specifically to whom they have lost. *See Langone v. Sobot,* 12 C 01646, R. 14-121 at 1-2.[5]

FanDuel acts as the conduit for transmission of the prize to the winner, but FanDuel does not risk any of its money in producing the prize money as the brokers did in *Pearce*. Rather, FanDuel functions as "the house," charging an entry fee to participate in the fantasy sports games it hosts. Illinois courts have held that "the winner and not the keeper of the house is liable to the loser," unless the keeper of the house also risks money in the gambling activity. *Holmes v. Brickey*, 82 N.E.2d 200, 202 (Ill. App. Ct. 3d Dist. 1948) (citing *Ranney v. Flinn*, 60 Ill. App. 104 (3d Dist. 1894)). Thus, in *Ranney,* the Court emphasized that the owner of a saloon who

---

[5] The Court previously discussed that a plaintiff under § 8(a) must to identify the winner, the amount lost to that winner, and the date of the loss—something a loser should be able to do as they can identify who they were competing against with some particularity. Someone such as Langone who wishes to step into the "loser's" shoes needs to allege that same information, something Langone has failed to do here.

provided a room for poker games was only a winner when he actually played in the games. 60 Ill. App. at 105. Similarly, in *Zellers v. White*, 70 N.E. 669, 671 (Ill. 1904), the owner of a gambling house was a winner not because he provided rooms for poker games, but because he also paid employees to participate in the poker games on behalf of the house. *See also Moushon v. AAA Amusement, Inc.*, 641 N.E.2d 1201 (Ill. App. Ct. 4th Dist. 1994) (restaurant owner who provided access to video poker games and slot machines was a "winner" because the owner gained the money people lost playing the games). Therefore, because FanDuel itself (and Kaiser in so far as Langone alleges that Kaiser is an operator of a fantasy sports website) does not participate in the risk associated with its fantasy sports games, it is not a "winner" for the purposes of the Loss Recovery Act.

Langone also argues that FanDuel participates in gambling and is a "winner" under the Loss Recovery Act because it "sells pools upon the result of any game or contest of skill or chance," activity which is defined as gambling by 720 ILCS 5/28-1(a)(6). Langone explains that

> A "Daily Fantasy" transaction is much like a horse-racing wager. The bettor buys a ticket, [c]hoosing a number of horses. The money wagered is pooled by the racetrack. The racetrack wins money on every wager. But the racetrack loses money on every race when it pays the winning wagers. The Racetrack always wins more than it loses. Thus the bettors always lose to the racetrack.
> Using Defendant's reasoning, a person could operate an illegal unlicensed horse-betting Internet site, but that person could not be sued by people who lost bets on horse races because Defendants do not pick horses they only participate by selling paramutel [sic] pool gambling tickets.

15

R. 17 at 14. Even if Langone's categorization of FanDuel's activity as "selling pools" is accurate, it is irrelevant to whether FanDuel is a winner under the Loss Recovery Act. The relevant question for the purposes of the Loss Recovery Act is not whether FanDuel's activity is illegal; the question is whether FanDuel is "the winner" with respect to any particular "loser." If, according to Langone's analogy, FanDuel never "pick[s] horses [but] participates by selling [pari-mutuel] pool gambling tickets," then FanDuel never risks its own money.[6] Since FanDuel does not risk its own money on the fantasy games it cannot be a winner or loser under the Loss Recovery Act.[7]

## B. Counts II and III

Similarly, Langone has not sufficiently alleged that FanDuel and Fantasy Sports Day Corp. are losers under the Loss Recovery Act because Langone has not alleged that either company participates in the risk associated with the fantasy sports games they host on their websites. Indeed, as the Court discussed previously, Langone alleges that FanDuel makes money from fantasy sports games not by

---

[6] The Oxford English Dictionary defines "pari-mutuel" as "[a] form of betting in which those backing the first three horses divide the total of the losers' stakes (*less the operator's commission*)." See http://www.oed.com/view/Entry/137910?redirectedFrom=Parimutuel#eid (emphasis added).

[7] Langone has submitted, R. 49-1, and the Court has reviewed the transcript of an Illinois state court's recent oral decision denying a motion for summary judgment in another case Langone filed under the Loss Recovery Act seeking money allegedly won by daily fantasy sports games participants. See *Langone v. Kaplan*, No. 13 M1-011444 (Ill. Cir. Ct. Cook Cnty. Aug. 26, 2013) (Snyder, J.). That court found that there were questions of fact about whether the daily fantasy sports games at issue were games of skill or chance, *id.* at 5:10-23, an issue the Court does not need to address here. To the extent that the state court held that Langone must allege and prove that "there has been a loss of greater than $50 to whom and when," *id.* at 6:1-8, it is in accord with the Court's holding here.

16

participating in the games as such, but by taking a "commission" from the entry fees. Langone fails to make such specific allegations with respect to Fantasy Sports Day Corp., but presumably Langone would have alleged that Fantasy Sports Day Corp. actually participated in the risk of the fantasy sports games if he had a basis to do so. Because Langone has failed to allege that FanDuel and Fantasy Sports Day Corp. participate in the risk associated with fantasy sports games, Langone has failed to allege that they are losers under the Illinois Loss Recovery Act, and thus, Counts II and III are dismissed.

## Conclusion

For the foregoing reasons, Defendants motion to dismiss, R. 12, is granted.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: October 9, 2013